## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **VERNITA MIRACLE-POND & SAMANTHA PARAF, individually and on behalf of all others similarly situated,** | |
| | Case No. 19 cv 04722 |
| **Plaintiffs,** | |
| | Judge Mary M. Rowland |
| **v.** | |
| | |
| **SHUTTERFLY, INC.,** | |
| | |
| **Defendant**. | |

## MEMORANDUM OPINION & ORDER

Plaintiffs Vernita Miracle-Pond and Samantha Paraf have sued Defendant Shutterfly, Inc. under the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.* Before the Court is Shutterfly's motion to compel arbitration for Ms. Miracle-Pond[1] and to stay the litigation pending the outcome of arbitration, and Plaintiffs' motion for curative measures. (Dkt. 19; Dkt. 38). For the reasons stated below, Shutterfly's motion is granted [19], and Plaintiffs' motion is denied [38]. Shutterfly's motion to dismiss [16] is stayed pending the outcome of arbitration.

## BACKGROUND

Ms. Miracle-Pond is a Shutterfly user with a Shutterfly account. (Dkt. 1, Ex. 1 ¶ 7). She registered for her Shutterfly account using the Shutterfly Android mobile

---

[1] Of the two Plaintiffs, only Ms. Miracle-Pond has a Shutterfly account subjecting her to Shutterfly's arbitration agreement. (Dkt. 1, Ex. 1, ¶¶ 7-8). Ms. Paraf alleges that she is not a Shutterfly user and has never had a Shutterfly account.

app in August 2014. (Dkt. 23 ¶ 3). During the registration process, the app displayed a page on Ms. Miracle-Pond's Android device. (Dkt. 23, Ex. 1, 2). In order to proceed past that page, Ms. Miracle-Pond was required to click a button that said "Accept" below the following statement: "By tapping 'Accept', you agree to use the Shutterfly for Android software and the associated Shutterfly services in accordance with Shutterfly's Terms of Use." (*Id*.). The page directed users to the Terms of Use: "To view a copy of the Terms of Use from your phone, tap the 'View Terms of Use' button below. You may also view the Terms of Use and Privacy Policy at shutterfly.com." (*Id*.). An image of the page's layout is replicated below:



(*Id*.).

Shutterfly has had various Terms of Use between 2014 and the filing of this suit. In the version of the Terms of Use from August 2014, the time Ms. Miracle-Pond

opened an account with Shutterfly, the first section reiterated that the user was accepting the Terms. The Terms of Use stated, in relevant part:

> Please read these Terms of Use ("Terms") carefully. They contain the legal terms and conditions that govern your use of and access to our websites, mobile sites, and mobile applications (collectively, our "Sites and Apps"), as well as our provision of products and services…
>
> By visiting any of our Sites and Apps, you are signifying your assent to these Terms and our Privacy Policy, which is incorporated herein by reference. Any products ordered or services used through any of our Sites and Apps are also governed by these Terms. We may revise these Terms from time to time by posting a revised version. YOUR CONTUNED USE OF ANY OF THESE SITES AND APPS AFTER WE POST SUCH CHANGES WILL CONSTITUTE YOUR ACCEPTANCE OF SUCH CHANGES. IN ADDTION, BY ORDERING PRODUCTS OR USING SERVICES, YOU ACKNOWLEDGE THAT YOU HAVE READ AND REVIEWED THESE TERMS IN THEIR ENTIRIETY, YOU AGREE TO THESE TERMS AND THE PRIVACY POLICY AND THESE TERMS CONSTITUTE BINDING AND ENFORCEABLE OBLIGATIONS ON YOU.

(Dkt. 23, Ex. 2, 2) (capitalization in original). Notably, the revision clause did not require notice of revisions to Shutterfly users, other than posting the new terms. (Dkt. 37, 3).

The 2014 Terms of Use included a class action waiver that stated:

> ANY DISPUTE RESOLUTION PROCEEDINGS, WHETHER IN ARBITRATION OR COURT, WILL BE CONDUCTED ONLY ON AN INDIVIDAUL BASIS AND NOT IN A CLASS OR REPRESENTATIVE ACTION OR AS A NAMED OR UNNAMED MEMBER IN A CLASS, CONSOLIDATED, REPRESENTATIVE OR PRIVATE ATTORNEY GENERAL LEGAL ACTION. YOUR ACCESS AND CONTINUED USE OF ANY OF OUR SITES AND APPS SIGNIFIES YOUR EXPLICIT CONSENT TO THIS WAIVER.

(Dkt. 23, Ex. 2, 14) (capitalization in original).

3

In May 2015, Shutterfly added an arbitration provision to its Terms of Use. (Dkt. 23, Ex. 3). Every version of Shutterfly's Terms of Use since May 2015, including the most recent version from September 2019, has included an arbitration provision. (Dkt. 23, Ex. 4). In each version, the preamble to the Terms stated: "NOTE: THIS TERMS OF USE CONTAINS AN ARBITRATION AND CLASS ACTION WAIVER PROVISION IN THE 'ARBITRATION' SECTION BELOW THAT AFFECTS YOUR RIGHTS UNDER THE TERMS OF USE AND WITH RESPECT TO ANY DISPUTE BETWEEN YOU AND US AND OUR AFFILIATES." (Dkt. 23, Ex. 3, 1; Dkt. 23, Ex. 4, 1) (capitalization in original). In both versions of the Terms, the arbitration clause states that "you and Shutterfly agree that any dispute, claim or controversy arising out of or relating in any way to the Shutterfly service, these Terms of Use and this Arbitration Agreement, shall be determined by binding arbitration." (*Id*.). The arbitration clause further explains that "[a]ll issues are for the arbitrator to decide, including issues relating to the scope and enforceability of this arbitration agreement." (*Id*.).

According to Shutterfly's records, Ms. Miracle-Pond uploaded nearly 300 photographs to her account between August 2014 and December 2018, ordered Shutterfly products on December 6, 2015, December 11, 2017, October 24, 2018, and December 8, 2018, and accessed her account as recently as April 22, 2019. (Dkt. 1, Ex.1, ¶ 3).

Ms. Miracle Pond and Ms. Palaf filed this lawsuit, on behalf of themselves and similarly situated Shutterfly users, in the Circuit Court of Cook County in June 2019.

(Dkt. 1 ¶ 1). They allege that Shutterfly violated BIPA by using facial-recognition technology to extract biometric identifiers for "tagging" individuals and by "selling, leasing, trading, or otherwise profiting from Plaintiffs' and Class Members' biometric identifiers and/or biometric information." (Dkt. 1, Ex. 1 ¶¶ 48-49). On July 12, 2019, Shutterfly removed to this Court. (Dkt. 1).

In September 2019, about three months after Ms. Miracle-Pond and Ms. Palaf filed this lawsuit, Shutterfly sent an email to all of its users nationwide. The email notified Shutterfly users that the Terms of Use had been updated. The email stated: "We're updating our Privacy Policy and Terms of Use, reflecting our ongoing commitment to be transparent about how we use your data and keep it safe. We invite you to read our policies in full, but here's a snapshot…." (Dkt. 22, Ex. 1). The email then listed four bullet points unrelated to arbitration before stating: "We also updated our Terms of Use to clarify your legal rights in the event of a dispute and how disputes will be resolved in arbitration." (*Id.*). Finally, the email advised users: "If you do not contact us to close your account by October 1, 2019, or otherwise continue to use our websites and/or mobile applications, you accept these updated terms." (*Id.*).

Shutterfly's records indicate that Ms. Miracle-Pond opened that email on September 8, 2019. (Dkt. 21, 4). As of October 2, 2019, Ms. Miracle-Pond's account remained open. (*Id.*). Plaintiffs believe the September 2019 email "was an improper *ex parte* communication with Plaintiff and putative class members because it failed to advise them of the pending litigation while seeking to deprive them of their rights as plaintiffs or class members." (Dkt. 37, 4). Before the Court are two motions:

Shutterfly's motion to compel arbitration, and Plaintiffs' motion for curative measures regarding the September 2019 email. (Dkt. 19; Dkt. 38).

## DISCUSSION

### 1. Motion to Compel Arbitration

Under the Federal Arbitration Act ("FAA"), "[a] written provision in … a contract… to settle by arbitration a controversy thereafter arising out of such contract … shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA "reflects a liberal federal policy favoring arbitration agreements," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346, 131 S. Ct. 1740, 179 L.Ed.2d 742 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 74 L.Ed.2d 765 (1983)), and places "arbitration agreements on an equal footing with other contracts." *Gore v. Alltel Comm'cns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (internal quotations omitted). It thereby follows that parties are not required to arbitrate unless they have agreed to do so. *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511, 94 S. Ct. 2449, 41 L.Ed.2d 270 (1974). "When deciding whether parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." *Druco Rest., Inc. v. Steak N Shake Enterp., Inc.*, 765 F.3d 776, 781 (7th Cir. 2014).

Courts deciding motions to compel arbitration apply a summary judgment standard in accordance with Federal Rule of Civil Procedure 56(c). *Tickanen v. Harris & Harris, Ltd.*, 461 F.Supp.2d 863, 866 (E.D. Wis. 2006); *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 74 (S.D.N.Y. 2017). Movants are required to "provide sufficient

evidence in support of their claims such that a reasonable jury could return a verdict for them under applicable law." *Friends for Health: Supporting North Shore Health Center v. PayPal, Inc.*, No. 17 C 1542, 2018 WL 2933608, at *3 (N.D. Ill. June 12, 2018) (citing *WFC Commodities Corp. v. Linnco Futures Group, Inc.*, No. 98 C 1354, 1998 WL 834374, at *2 (N.D. Ill. Nov. 25, 1998)). "The party opposing arbitration must identify a triable issue of fact concerning the existence of agreement" and "cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The Court may consider exhibits and affidavits regarding the arbitration agreement. *Friends for Health*, 2018 WL 2933608, at *3.

### a. Whether Ms. Miracle-Pond Agreed to the Terms of Use

A party seeking to compel arbitration must first establish that an arbitration agreement exists.[2] *Gen. Ass'n of Regular Baptist Churches v. Scott*, 549 F. App'x. 531, 533 (7th Cir. 2013). Whether an agreement to arbitrate has been formed is governed by state law.[3] *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016). Ms.

---

[2] Shutterfly claims that this threshold issue should be decided by the arbitrator. (Dkt. 21, 12-13). Under the FAA, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010). The "delegation" clause here states: "[a]ll issues are for the arbitrator to decide, including issues relating to scope and enforceability of this arbitration agreement." (Dkt. 23, Ex. 3, 16). Notably, this clause does not explicitly delegate questions of contract formation to the arbitrator. Ms. Miracle-Pond contests whether a contract was formed at all. Thus, the Court addresses the question of contract formation before deciding to compel arbitration. *Mohammed v. Uber Techs., Inc.*, 237 F.Supp.3d 719, 728 (N.D. Ill. 2017) ("it is the court and not the arbitrator that 'must decide whether a contract exists before it decides whether to stay an action and order arbitration'") (quoting *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 741 (7th Cir. 2010)).

[3] In their memoranda, both parties cite to Illinois contract law to analyze whether the parties formed an agreement to arbitrate. They thus agree that Illinois law governs the question of contract formation. Accordingly, the Court need not perform a choice-of-law analysis. *See Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1271 n.3 (7th Cir. 1996).

Miracle-Pond argues that she did not assent to Shutterfly's terms of use when she formed her Shutterfly account. Arguing that the Terms of Use are a "browsewrap" agreement, Ms. Miracle-Pond contends that she merely agreed that her *use* of Shutterfly's website and services would comply with the Terms of Use, not that she would be bound by them. (Dkt. 37, 6). The Court must thus determine whether Ms. Miracle-Pond agreed to the Terms of Use when she created a Shutterfly account.

"Although contracts formed by creating an account on a website are a 'newer form[ ] of contracting,' the same common law contract principles apply." *Topstep Trader, LLC v. OneUp Trader, LLC*, No. 17 C 4412, 2018 WL 1859040, at *2 (N.D. Ill. Apr. 18, 2018) (citing *Sgouros*, 817 F.3d at 1034). "In Illinois, as in many states, the law governing the formation of contracts on the Internet is still in the early stages of development. But there is no reason to think that Illinois's general contract principles do not apply. Formation of a contract requires mutual assent in virtually all jurisdictions; Illinois courts use an objective approach to that question." *Sgouros*, 817 F.3d at 1034; *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."). The relevant inquiry for contract formation via the Internet is (1) "whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement," and (2) "whether the circumstances support the assumption that the purchaser receives reasonable notice of those terms." *Sgouros*, 817 F.3d at 1034. Such an inquiry is "fact-intensive." *Id.*

8

Given the fact-intensive nature of the inquiry, the precise wording and formatting is relevant here. An image of the Shutterfly page is replicated above. That page included a button that said "Accept" below the following statement: "By tapping 'Accept', you agree to use the Shutterfly for Android software and the associated Shutterfly services in accordance with Shutterfly's Terms of Use." (Dkt. 23, Ex. 1, 2). The page directed users to the Terms of Use: "To view a copy of the Terms of Use from your phone, tap the 'View Terms of Use' button below. You may also view the Terms of Use and Privacy Policy at shutterfly.com." (*Id*.). Users were required to hit either "Accept" or "Decline" in order to proceed with account sign-up.

The parties dispute whether the alleged agreement before the Court is a "clickwrap" or "browsewrap" agreement. A "clickwrap" agreement is formed when a website user clicks a button or checks a box that explicitly affirms that the user has accepted the terms after having the opportunity to scroll through the terms posted on the website, and this type of agreement is generally enforced. *Topstep Trader*, 2018 WL 1859040, at *2; *Sgouros v. TransUnion Corp.*, No. 14 C 1850, 2015 WL 507584, at *4 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.2d 1029 (7th Cir. 2016) (citing *Nguyen v. Barnes & Noble*, 763 F.3d 1171, 1175-76 (9th Cir. 2014)); *see also*, *Van Tassell v. United Mktg. Grp., LLC*, 795 F.Supp.2d 770, 790 (N.D. Ill. 2011) (courts "regularly uphold" clickwrap agreements when structured properly). A "browsewrap" agreement, on the other hand, is an agreement where users are bound by the website's terms by merely navigating or using the website; the user is not required to sign an electronic document or explicitly click an "accept" or "I agree" button. *Sgouros*,

2015 WL 507584, at *6. "Courts enforce browsewrap agreements only when there is actual or constructive knowledge of terms." *Id*.

According to Ms. Miracle-Pond, Shutterfly presented users with a browsewrap agreement because the text above the "Accept" button stated: "By tapping 'Accept', you agree to use the Shutterfly for Android software and the associated Shutterfly services in accordance with Shutterfly's Terms of Use." Because the page did not say: "by tapping 'Accept', you agree to the Terms of Use," Ms. Miracle-Pond argues that she only agreed to *use* Shutterfly services in accordance with the Terms of Use; she did not assent to be bound by the Terms of Use. (Dkt. 37, 6). Yet this distinction is largely irrelevant given the nature of the agreement. The crucial difference between a clickwrap and browsewrap agreement is that the former requires affirmative assent and affirmative action, while the latter does not. *Sgouros*, 2015 WL 507584, at *6 (browsewrap agreements "do not require users to 'sign a document or click an 'accept' or 'I agree' button'") (citing *Nguyen*, 763 F.3d at 1176). Here, Shutterfly's page presented the Terms of Use for viewing, stated that clicking "Accept" would be considered acceptance of the Terms of Use, and provide both an "Accept" and "Decline" button. Because Shutterfly's "app contained a clear and conspicuous statement that … a user agreed to the Terms of Service and Privacy Policy" by clicking a link or pressing a button, a reasonable user who completes that process would understand that she was manifesting assent to the Terms. *Johnson v. Uber Techs., Inc.*, No. 16 C 5468, 2019 WL 4503989, at *4-5 (N.D. Ill. Sep. 20, 2018) (finding a valid clickwrap agreement). Ms. Miracle-Pond has failed to raise a genuine dispute

10

as to whether she entered into an enforceable agreement with Shutterfly. Shutterfly's agreement is clearly a valid clickwrap agreement and Ms. Miracle-Pond agreed to be bound by Shutterfly's Terms of Use.

Ms. Miracle-Pond argues that even if a contract formed between the parties, there is no valid agreement to arbitrate because (1) arbitration clauses subject to unilateral modification are illusory, (2) Ms. Miracle-Pond could not have assented to the arbitration provision because Shutterfly failed to provide notice of the 2015 modification, and (3) arbitration clauses that apply retroactively are unenforceable. She additionally argues that even if the arbitration clause is valid, plaintiffs cannot waive their rights to class arbitration of their claim for an injunction under the *McGill* rule. The Court shall address each argument in turn.

### b. 2015 Unilateral Modifications to the Terms of Use

As noted above, the Terms of Use accepted by Ms. Miracle-Pond in 2014 did not contain an explicit arbitration provision.[4] Shutterfly added an arbitration provision to its Terms of Use in May 2015. (Dkt. 21, 9).

Ms. Miracle-Pond first argues that arbitration clauses subject to unilateral modification are illusory.[5] Illinois Courts allow parties to agree to authorize one party to modify a contract unilaterally. *See, e.g.*, *Williams v. TCF Nat'l Bank*, No. 12 C 5115,

---

[4] The terms of use did, however, contain a class action waiver and addressed voluntary arbitration. (Dkt. 23, Ex. 2, 14).

[5] Ms. Miracle-Pond makes this argument under both Illinois and California law. She notes that the Terms of Use include a California choice of law provision. However, regarding unilateral modifications and retroactive arbitration agreements, California law and Illinois law do not compel different results. Accordingly, the Court analyzes these two issues under Illinois law. *See Friends for Health: Supporting North Shore Health Center v. PayPal, Inc.*, No. 17 C 1542, 2018 WL 2933608, at *6 n. 9 (N.D. Ill. June 12, 2018) (applying the law of the forum state when the parties identified two states' laws that did not compel different results).

2013 WL 708123, at *9 (N.D. Ill. Feb. 26, 2013) ("In Illinois … unilateral modification clauses are enforceable") (citing *Garber v. Harris Trust & Sav. Bank*, 104 Ill.App.3d 675 (Ill.App.Ct. 1982)); *Kinkel v. Cingular Wireless LLC*, 223 Ill.2d 1, 14 (Ill. 2006) (in Illinois, parties may "expressly reserve[ ] the right to unilaterally modify terms and conditions of the agreement, at any time, without notice"). More specifically, Illinois courts have repeatedly recognized the enforceability of arbitration provisions added via a unilateral change-in-terms clause. *See, e.g.*, *Williams v. TCF Nat'l Bank*, 2013 WL 708123, at *6, 9 (enforcing revised arbitration provision added via a change-in-terms clause); *Sherman v. AT&T Inc.*, No. 11 C 5857, 2012 WL 1021823, at *4 (N.D. Ill. Mar. 26, 2012) (enforcing revised arbitration agreement because "[t]he Court finds that [the plaintiff] agreed to a contract with a change-in-terms provision"); *Rosen v. SCIL, LLC*, 343 Ill.App.3d 1075, 1082 (2003) (enforcing arbitration agreement added to cardholder agreement because "[i]f plaintiff did not wish to agree to the new terms in his credit card agreement, he simply should have stopped using the card").[6] As long as the parties agree that one party may unilaterally modify the terms of the contract, a unilateral modification is not illusory, and courts frequently enforce those modifications.

The Terms of Use Ms. Miracle-Pond accepted in 2014 included a change-in-terms provision. That provision stated that Shutterfly "may revise these Terms from

---

[6] Unilateral amendments are similarly allowed under California law. *Friends for Health*, 2018 WL 2933608, at *3 (noting that "a significant body of California law approv[es] of contract provisions that allow unilateral amendments" to arbitration agreements); *see also Ashbey v. Archstone Prop. Mgmt., Inc.*, 612 Fed.App'x 430, 432 (9th Cir. 2015) ("[U]nilateral modification provisions…are not substantively unconscionable because they are always subject to the limits imposed by the covenant of good faith and fair dealing implied in every contract"); *Serpa v. Cal. Sur. Investigations, Inc.*, 215 Cal.App. 4th 695, 706 (Cal. Ct. App. 2013) (collecting cases).

time to time by posting a revised version." (Dkt. 23, Ex. 2, 2). The Terms of Use further explained:

> YOUR CONTINUED USE OF ANY OF THE SITES AND APPS AFTER WE POST ANY CHANGES WILL CONSTITUTE YOUR ACCEPTANCE OF SUCH CHANGES… BY ORDERING PRODUCTS OR USING SERVICES, YOU ACKNOWLEDG THAT YOU HAVE READ AND REVIEWED THE TERMS IN THEIR ENTIREITY, YOU AGREE TO THESE TERMS AND THE PRIVACY POLICY AND THESE TERMS CONSTITUTE BINDING AND ENFORECABLE OBLIGATIONS ON YOU.

(Dkt. 23, Ex. 2, 2) (capitalization in original). Shutterfly's Terms of Use included a valid change-in-terms provision; it informed users that Shutterfly had the right to unilaterally modify its terms, that modified terms would be posted on Shutterfly's website, and that continued use of Shutterfly products constitutes acceptance of the modified terms. Thus, Ms. Miracle-Pond agreed that her continued use of Shutterfly's services would communicate her assent to the most recent version of the Terms of Use posted online at the time of her use. After Shutterfly posted the amended terms in May 2015, Ms. Miracle-Pond placed four orders for products between December 2015 and December 2018. Ms. Miracle-Pond's continued use of her Shutterfly account and Shutterfly services indicates acceptance of Shutterfly's modifications and the arbitration clause.

Ms. Miracle-Pond counters that Illinois courts only uphold change-in-term provisions when the plaintiff is given notice of the change. She further argues that she could not assent to an arbitration provision of which she had no notice. However, the Illinois Supreme Court has explained that when a "service agreement…expressly reserve[s] the right" of the drafter "to unilaterally modify the terms and conditions of

13

the agreement, at any time, *without notice*," and the customer "accepted this condition" by signing the service agreement, the drafter's right to subsequently modif[y] the arbitration provision in that agreement ends only when the service agreement is "terminated" and "no longer in effect." *Kinkel v. Cingular Wireless LLC*, 223 Ill.3d 1, 14 (Ill. 2006) (emphasis added). Illinois courts have additionally rejected the argument that notice of an amendment is necessary to create "mutual assent" to the amended contract. On the contrary, when parties agree in advance to allow unilateral modifications to the terms of their contract, subsequent modifications are binding regardless of whether the other party later "accepts" the change. *Southport Bank v. Miles*, No. 10 C 8321, 2014 WL 1292452, at *2-3 (N.D. Ill. Mar. 27, 2014) (rejecting the argument that "unilateral contract modifications are not valid" and holding that, where the parties to an agreement "expressly reserved the right" of one party "to unilaterally modify the loan agreement," such modifications were valid and enforceable even if they were "never assented to" by the counterparty) (citing *Kinkel*, 223 Ill.3d at 14).

Such is the case here. In 2014, Ms. Miracle-Pond entered into a service contract that explicitly gave Shutterfly's the right to unilaterally modify the agreement at any time and without notice, other than posting the modified terms on their website. It is undisputed that Shutterfly posted the modified Term of Use on its website in May 2015. Ms. Miracle-Pond indicated her acceptance to the modified Terms of Use by continuing to use Shutterfly products. Her arguments regarding lack of notice are

thus unavailing. Ms. Miracle-Pond is accordingly bound by the 2015 modifications to the Terms of Use.[7]

### c. 2019 Modification and Retroactive Application

Ms. Miracle-Pond takes issue with the September 2019 email sent to Shutterfly users. Describing the email as "a desperate strategic 'Hail Mary,'" Ms. Miracle-Pond argues that this email did not create a binding agreement to arbitrate and cannot apply retroactively to her claim.[8] (Dkt. 37, 10). The Court is unpersuaded by these arguments.

First, Ms. Miracle-Pond argues that the September 2019 email failed to provide sufficient notice that the arbitration clause had been added to the Terms of Use.[9] The Court addressed arguments regarding notice in the previous section, holding that the agreement between the parties did not require notice of modifications other than a posting on Shutterfly's website (Shutterfly provide such a posting). Additionally, the cases cited by Ms. Miracle-Pond in support of her arguments regarding the 2019 email's lack of notice are inapposite. Those cases address arbitration clauses that were hidden beneath multiple confusing hyperlinks

---

[7] Ms. Miracle-Pond argues in passing that this situation is different because Shutterfly added a whole new arbitration section, instead of modifying an existing one. First, this fact does not change the Court's analysis regarding unilateral modification. Second, the 2014 Terms of Use included a dispute resolution provision that addressed voluntary arbitration and included a class action waiver. The 2015 modification was just that—a modification of existing dispute resolution procedures.

[8] This email is also the subject of a motion for curative measures (Dkt. 38), discussed in Section 2.

[9] Ms. Miracle-Pond believes that Shutterfly "purposeful[ly] concealed" the arbitration clause from its users by making the body of the email largely about the Privacy Policy and other changes to the Terms of Use. As noted above, the email stated: "We're updating our Privacy Policy and Terms of Use, reflecting our ongoing commitment to be transparent about how we use your data and keep it safe." The second paragraph stated, "We invite you to read our policies in full, but here's a snapshot:" followed by four bullet points unrelated to arbitration. Underneath that bullet point list, the email stated: "We also updated our Terms of Use to clarify your legal rights in the event of a dispute and how disputes will be resolved in arbitration." (Dkt. 22, Ex. 1).

in browsewrap agreements. *Van Tassel v. United Mktg. Group, LLC*, 795 F.Supp.2d 770, 793 (N.D. Ill. 2011); *Hussein v. Coinabul, LLC*, No. 14 C 5735, 2014 WL 7261240, at *3 (N.D. Ill. Dec. 19, 2014). That is not the situation here.

Second, Ms. Miracle-Pond argues that a new agreement to arbitrate cannot apply retroactively to her existing claims. (Dkt. 37, 12); *Morrison v. Amway*, 517 F.3d 248, 257 (5th Cir. 2008) (refusing to enforce arbitration clause because there was no "savings clauses which preclude[d] application of such amendments to disputes which arose…before the amendment."); *In re Zappos.com, Inc. Customer Data Sec. Breach Litig.*, 893 F.Supp.2d 1058 (D. Nev. 2012). The premise of this argument is that Ms. Miracle-Pond did not agree to arbitration before she filed this lawsuit in June 2019, and that the September 2019 email was an attempt to retroactively force her into arbitration. However, this Court has determined that Ms. Miracle-Pond is bound by the 2015 modification. She accordingly agreed to her arbitrate her claims in 2015— well before she filed this lawsuit. The Court declines to address this argument any further.[10]

### d. *McGill* Rule

Finally, in a footnote, Ms. Miracle-Pond argues that even if Shutterfly's arbitration clause is valid, it is unenforceable under California's *McGill* rule.[11] (Dkt. 37, 8 n. 3). Under *McGill v. Citibank,* plaintiffs cannot waive their right to public

---

[10] The Court additionally declines to address Ms. Miracle-Pond's arguments regarding her failure to close her account after receiving the email.

[11] In the body of Ms. Miracle-Pond's brief, she relies exclusively on Illinois law. In one footnote, Ms. Miracle-Pond argues that the terms of the contract should be governed by California law. Up until this point, California law and Illinois law did not compel different results, so the Court applied Illinois law. Because the two states' laws now diverge, the Court addresses this issue under California law.

16

injunctive relief in any forum, including in arbitration. 2 Cal.5th 945, 215 Cal.Rptr. 627, 393 P.3d 85 (2017); *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019) (holding that the *McGill* rule is not preempted by the FAA). Ms. Miracle-Pond asserts that "Plaintiffs' cannot waive their rights to class arbitration of their claim for an injunction prohibiting Shutterfly from continuing to collect face scans of Illinois residents notwithstanding the 'class waiver' provision in the [Term of Use]." (Dkt. 37, 9). In its respective footnote, Shutterfly argues that the *McGill* rule only applies to claims arising under California's consumer protection laws, and that the Plaintiffs in this case are not seeking a public injunction, but a private one. *See Roberts v. AT&T*, No. 15 C 3418-EMC, 2018 WL 1317346, at *9 (N.D. Cal. Mar. 14, 2018) (compelling arbitration of non-Californians, despite *McGill*, because the substantive claim arose under Alabama law) *aff'd* 801 Fed.App'x. 492; *Diaz v. Nintendo of America Inc.*, No. C19-1116 TSZ, 2020 WL 996859, at *1 n.4 (W.D. Wash. Mar. 2, 2020) (same); *Wright v. Sirius XM Radio Inc.*, No. SACV 16-01688, 2017 WL 4676580, at *9-10 (C.D. Cal. June 1, 2017) (relief that would "solely benefit the putative class members" is not "public" relief under *McGill*).

Here, Plaintiffs' substantive claim arises under an Illinois statute: BIPA. It does not arise under the consumer protection laws of California. Accordingly, the McGill rule does not apply to the arbitration agreement in this case. *Roberts*, 2018 WL 1317346, at *9; *Diaz*, 2017 WL 4676580, at *1 n. 4. Ms. Miracle-Pond entered into a valid arbitration agreement, and the Court grants Shutterfly's motion to compel arbitration.

## 2. Curative Measures

Plaintiffs move for curative measures based on the September 2019 email. Plaintiffs believe this email was an attempt by Shutterfly to "surreptitiously" bind unwitting putative class members to arbitration agreements. (Dkt. 38, 1). Plaintiffs claim that the email was an improper *ex parte* communication, and make two main arguments for curative measures: 1) the email imposed an arbitration clause on putative class members, and 2) the email was misleading because recipients were not told about this lawsuit or given contact information for Plaintiffs' counsel. The Court disagrees on both fronts and declines to impose curative measures.

A court has supervisory authority over a defendant's communications with putative class members. *See* Fed. R. Civ. Pro. 23(d). Indeed, "[b]ecause of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil v. Bernard*, 452 U.S. 89, 100, 101 S. Ct. 2193, 68 L.Ed.2d 693 (1981); *see also Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 171, 110 S. Ct. 482, 107 L.Ed.2d 480 (1989) ("We have recognized that a trial court has a substantial interest in communications that are mailed for single actions involving multiple parties"). Courts "have repeatedly used this authority to bar or invalidate class action waivers and arbitration clauses procured from potential class members who were not provided adequate notice of the pending action." *Brodsky v. HumanaDental Ins. Co.*, No. 10 C 03233, 2016 WL 5476233, at *12 (N.D. Ill. Sep. 29, 2016) (citing *Piekarsi v. Amedisys Illinois, LLC*, 4 F.Supp.3d 952, 956 (N.D. Ill. 2013) (court invalidated an

arbitration agreement sent to putative class members and required defendant to send a corrective notice)).

First, Plaintiffs' characterization of the email is largely incorrect. Plaintiffs argue that this email was an attempt to bind unwitting class members to an arbitration agreement after this lawsuit was filed. Yet Shutterfly had an arbitration agreement in its Terms of Use since May 2015. As the Court already determined above, individuals who created Shutterfly accounts before the May 2015 modification, and continued to use Shutterfly's services, are bound by the 2015 agreement to arbitrate. Individuals who signed up for a Shutterfly account after May 2015 are also bound by that arbitration agreement. Importantly, the Court did not rely on September 2019 email to reach that conclusion. The September 2019 email did not impose a new arbitration provision on putative class members. Rather, Shutterfly users and accountholders were already bound by the 2015 arbitration agreement.[12]

Additionally, the cases cited by Plaintiffs in support of their motion are distinguishable. Those cases involved defendants who, during the litigation, sought to impose arbitration agreements for the first time on class members for the purpose of thwarting the class action. *See, for example, DeGidio v. Crazy House Saloon & Rest.*, 880 F.3d 135, 138 (4th Cir. 2018) ("at the very end of the discovery period […], Crazy Horse began entering [into] arbitration agreements with entertainers who had

---

[12] Plaintiffs claim that the 2019 email is "the basis for Shutterfly's claim that certain of the class members are subject to mandatory arbitration." (Dkt. 38, 14). Yet Shutterfly concedes in its brief that it is not relying on the 2019 email to bind class members to arbitration. Rather, Shutterfly states that all class members are "bound by the class action waiver in the 2015 arbitration provision." (Dkt. 47, 7). This statement is consistent with the Court's earlier finding. The 2019 email has no bearing on whether class members agreed to arbitrate.

19

worked at the club"); *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 919 (11th Cir. 2014) (defendant "did not conceive or begin to institute its ADR policy" until briefing schedule set on motion for conditional certification of collective action); *Brodsky*, 2016 WL 5476233, at *12 (new arbitration agreements sent to class members "long after this case was filed" and shortly before class-certification briefing). Other cases cited by Plaintiffs either do not involve arbitration agreements but rather outright releases, or include attempts to intimidate class members. *See, for example, Marino v. CACafe, Inc.*, No. 16 C 6291, 2017 WL 1540717, at *1 (N.D. Cal. Apr. 28, 2017) (defendants emailed a release to employees that "did not state that a lawsuit had been filed"); *Sloan v. Ameristar Casinos, Inc.*, No. 12 C 01126, 2013 WL 5548316, at *1-2 (D. Colo. Oct. 3, 2013) (employer sent letters and conducted one-on-one interviews "intentionally intended to frighten and dissuade" employees from "joining the class"). Unlike Plaintiffs' cited cases, Shutterfly did not add a new arbitration agreement while this lawsuit was pending in an attempt to thwart the class action. Rather, Shutterfly's users were already bound by an arbitration agreement that had been in existence for several years before this lawsuit began. There is also no indication that Shutterfly's email was an attempt to secure a release or intimidate class members.

Plaintiffs only cite to one case, *Balasanyan v. Nordstrom, Inc.*, in which a court invalidated an amended arbitration provision. No. 11 C 2609, 2012 WL 760566 (S.D. Cal. Mar. 8, 2012). In that case, the existing arbitration clause did not cover the claims brought by the plaintiff. *Id.* at *1-2. After the plaintiff filed suit, the defendant

amended the clause to cover the plaintiff's claims and added a class waiver. *Id*. That is not the situation here. The 2019 modifications did not significantly alter the scope of the arbitration agreement or add a class waiver. Rather, the 2019 update made three changes: 1) updated the name of the arbitral rules, 2) stylistic changes to bold the arbitration provision and make it more prominent, 3) clarified that claims that cannot lawfully be arbitrated on an individual basis should proceed in court. Only the last change is substantive, and it does not apply here.[13]

There is no indication that Shutterfly engaged in any improper conduct: "[t]here is no evidence of deceptive conduct, no evidence of coercion, no evidence of targeting putative Class Members, no evidence of imposing arbitration without agreement or without additional consideration." *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 C 6950, 2020 WL 1467182, at * (S.D.N.Y. Mar. 26, 2020). The 2019 email does not affect class members' rights. The Court has not and will not rely on the 2019 email to find that any putative class members agreed to arbitrate. Indeed, Shutterfly conceded that the Court need not rely on the 2019 email for that purpose. No remedial measures are necessary.

## CONCLUSION

For the reasons stated above, the Court grants Shutterfly's motion to compel arbitration for Ms. Miracle-Pond and stay proceedings. (Dkt. 19). Plaintiffs' motion

---

[13] This change addresses the Ninth Circuit's decision in *McCardle v. AT&T Mobility, LLC*, 772 F.App'x 575 (9th Cir. 2019), *pet. for reh'g pending*, No. 17-17246 (filed Aug. 9, 2019), which voided an entire arbitration agreement because the class action waiver was unenforceable. Shutterfly's change clarified that if a court were to find the class action waiver unenforceable as to some claims, those claims should proceed in court. (Dkt. 47, 14).

for curative measures is denied. (Dkt. 38). Shutterfly's motion to dismiss [16] is stayed pending the outcome of arbitration.

E N T E R:

Dated: May 15, 2020

_____
MARY M. ROWLAND
United States District Judge